# UNITED STATES DISTRICT COURT

*for the*

# SOUTHERN DISTRICT OF NEW YORK

### Case No. 07-cv-05997-GBD

## WILMINGTON TRUST, *AS INDENTURE TRUSTEE,*

*Plaintiff-Appellant,*

**– v. –**

## SOLUTIA, INC.

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF PLAINTIFF-APPELLANT
## WILMINGTON TRUST, AS INDENTURE TRUSTEE

REED SMITH LLP

Eric A. Schaffer (ES 6415)
James C. Martin (*Pro hac vice*)
435 Sixth Avenue
Pittsburgh, Pennsylvania  15219
Email:  eschaffer@reedsmith.com
        jcmartin@reedsmith.com
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063

Andrew L. Morrison (AM 1071)
599 Lexington Avenue
New York, New York  10022
Email: amorrison@reedsmith.com
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450

*Attorneys for Plaintiff-Appellant Wilmington Trust Company, as Indenture Trustee*

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ............................................1

STATEMENT OF THE ISSUES PRESENTED AND STANDARD OF REVIEW .....................1

STATEMENT OF THE CASE ....................................................................................................4

    A.    1997:  Solutia Is Formed As A Spin-Off From Monsanto, Inherits Monsanto's Significant Legacy Liabilities, And Obtains $450 Million In Needed Financing Pursuant To An Indenture Agreement ......................................4

    B.    2000-2002:  Solutia Experiences Severe Economic Problems, It Requires Additional Financing, And The Trustee's Claims Become Secured Under The Equal And Ratable Clause In The Indenture ......................................................7

    C.    2003:  As Its Financial Condition Continues To Deteriorate, Solutia Accelerates Its Bankruptcy Planning And Carries Out A Plan To Desecuritize The Trustee's Claims Under The Indenture Prior To An Anticipated Bankruptcy Filing ..............................................................................8

    D.    Solutia's Bankruptcy Filing And The Trial Of The Trustee's Legal And Equitable Claims Regarding The Stripping Of Its Security ..................................12

SUMMARY OF ARGUMENT AND RELIEF REQUESTED ....................................................17

ARGUMENT ............................................................................................................................18

    A.    Solutia's Scheme To Desecuritize The Trustee's Claims Breached The Indenture's Express Terms ...................................................................................18

        1.    Solutia's Security Stripping Scheme Violated The Express Terms Of The Indenture That Are Intended To Protect The Trustee ..................20

        2.    Solutia's Attempted Release Of The Trustee's Security Breached The Indenture's Express Provisions Controlling The Release Of That Security ....................................................................................26

        3.    Solutia's Accounting Manipulation In Failing To Write Down Its Asset Valuation Before The Stage One Loan Breached The Indenture's Express Terms ....................................................................32

        4.    Solutia's Refusal To Recognize The Effect Of The Blanket Liens Created By The Stage Two Loan Breached The Indenture's Express Terms ................................................................................34

    B.    Solutia's Implementation Of Its Security Stripping Scheme Independently Breached The Covenant Of Good Faith And Fair Dealing Implied In The Indenture ..................................................................................................36

C.    The Bankruptcy Court Committed Reversible Error When It Failed To Address The Trustee's Claims For The Equitable Preservation Of Its Liens........42

       1.    Equity Should Treat The Stage One And Stage Two Loans As A Single Overall Transaction For The Purpose Of Preserving The Trustee's Secured Status ............................................................................43

       2.    Equity Should Maintain The Trustee's Secured Status To Preserve Its Legitimate Expectations..........................................................................46

D.    The Bankruptcy Court Committed Reversible Error In Failing To Consider Whether The Trustee Is Entitled To Adequate Protection ....................48

CONCLUSION...................................................................................................................49

# **TABLE OF AUTHORITIES**

## CASES

*Alleco, Inc. v. IBJ Schroder Bank & Trust Co.,*
    745 F. Supp. 1467 (D. Minn. 1989)................................................................... 45

*American Home Assurance Co. v. Baltimore Gas & Elec. Co.,*
    845 F.2d 48 (2d Cir. 1988)........................................................................... 31

*Andrew Crespo Gallery, Inc. v. C.I.R.,*
    86 F.3d 42 (2d Cir. 1996) ........................................................................... 3

*Batchelder v. Council Grover Water Co.,*
    131 N.Y. 42 (1892) ................................................................................. 23

*Beal Sav. Bank v. Sommer,*
    8 N.Y.3d 318 (2007) ............................................................................... 20

*Butner v. United States,*
    440 U.S. 48 (1979)........................................................................ 34, 35, 36

*Century Marine Inc. v. United States,*
    153 F. 3d 225 (5th Cir. 1998) ..................................................................... 25

*Chase Manhattan Bank v. Keystone Distributors, Inc.,*
    873 F. Supp. 808 (S.D.N.Y. 1994)............................................................. 38, 40

*Chase Nat. Bank v. Sweezy,*
    281 N.Y.S. 487 (Sup. Ct. 1931) ............................................................... 46, 47

*Delta Truck & Tractor Inc. v. J.I. Case Co.,*
    975 F.2d 1192 (5th Cir. 1992) ..................................................................... 25

*Don King Productions, Inc. v. Douglas,*
    742 F. Supp. 741 (S.D.N.Y. 1990)................................................................. 38

*Dweck Law Firm, L.L.P. v. Mann,*
    340 F.Supp. 2d 353 (S.D.N.Y.  2004)............................................................. 36

*Elka Educators, Inc. v. Sidrian Educators, Ltd.,*
    1977 U.S. Dist. LEXIS 14969 (S.D.N.Y. July 15, 1977) ................................................ 25

*Filner v. Shapiro,*
    633 F.2d 139 (2d Cir. 1980)........................................................................ 36

*First Capital Asset Mgmt. Inc. v. Brickellbush, Inc.,*
    219 F. Supp. 2d 576 (S.D.N.Y. 2002)............................................................... 4

*Fleischman v. Furgueson,*
    223 N.Y. 235 (1918) ............................................................................... 19

*Four Points Shipping & Trading, Inc. v. Poloron Israel, L.P.,*
  846 F. Supp. 1184 (S.D.N.Y. 1994).................................................................... 23

*Galli v. Metz,*
  973 F.2d 145 (2d Cir. 1992)............................................................................... 31

*Gil Enters., Inc. v. Delvy,*
  79 F.3d 241 (2d Cir. 1996)...............................................................................2-3

*Granite Partners, L.P. v. Bear, Stearns & Co.,*
  17 F. Supp. 2d 275 (S.D.N.Y. 1998).................................................................. 37

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,*
  723 F. Supp. 976 (S.D.N.Y. 1989)..................................................................38-39

*HBE Leasing Corp. v. Frank,*
  48 F.3d 623 (2d Cir. 1995)................................................................................. 44

*Huber v. Marine Midland Bank,*
  51 F.3d 5 (2d Cir. 1995)...................................................................................... 4

*IBM Poughkeepsie Employees Fed'l Credit Union v. Cumis Ins. Soc., Inc.,*
  590 F. Supp. 769 (S.D.N.Y. 1984)..................................................................... 23

*In re Associated Gas & Elec. Co.,*
  61 F. Supp. 11 (S.D.N.Y. 1944).................................................................... 44, 45

*In re Best Products, Co.,*
  157 B.R. 222 (Bankr. S.D.N.Y. 1993)........................................................... 44, 46

*In re Carmania Corp.,*
  154 B.R. 160 (S.D.N.Y 1993)............................................................................ 35

*In re Enron Corp.,*
  292 B.R. 507 (S.D.N.Y. 2002).............................................................................. 3

*In re Howard's Appliance Corp.,*
  874 F.2d 88 (2d Cir. 1989)........................................................................... 47, 48

*In re Kaiser Aluminum Corp.,*
  456 F.3d 328 (3d Cir. 2006)............................................................................... 42

*In re Northport Marina Assoc.,*
  136 B.R. 911 (E.D.N.Y. 1992) ........................................................................... 35

*In re Phar-Mor Sec. Litig.,*
  185 B.R. 497 (W.D. Pa. 1995)............................................................................ 44

*In re Revere Copper and Brass, Inc.,*
  60 B.R. 887 (Bankr. S.D.N.Y. 1985).................................................................. 30

*In re Smart World Technologies, LLC,*
  423 F.3d 166 (2d Cir. 2005)................................................................................. 2

*In re St. Casimir Dev. Corp.*,
     358 B.R. 24 (S.D.N.Y. 2007) .................................................................................... 2

*In re Vienna Park Properties*,
     976 F.2d 106 (2d Cir. 1992) ............................................................................... 35, 36

*In re Vienna Park Properties*,
     136 B.R. 43 (S.D.N.Y. 1992) ................................................................................. 35

*In re WestPoint Stevens, Inc.*,
     333 B.R. 30 (S.D.N.Y. 2005) ................................................................................. 49

*Interallianz Bank AG v. Nycal Corp.*,
     1995 WL 406112 (S.D.N.Y. July 7, 1995) ........................................................... 27

*International Customs Assocs., Inc. v. Ford Motor Co.*,
     893 F. Supp. 1251, 1255 (S.D.N.Y. 1995) ........................................................... 27

*International Multifoods Corp. v. Commercial Union Ins. Co.*,
     309 F.3d 76 (2d Cir. 2002) .................................................................................... 31

*Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending
     Mach. Local 550*,
     167 F.3d 764 (2d Cir. 1999) .................................................................................. 31

*Jaffe v. Paramount Communications Inc.*,
     644 N.Y.S.2d 43 (N.Y. App. Div. 1996) ............................................................... 37

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
     4 F.3d 1103 (3d Cir. 1993) ...................................................................................... 3

*Kirke La Shelle Co. v. Paul Armstrong Co.*,
     263 N.Y. 79 (1933) ................................................................................................ 41

*LaSalle Bank Nat'l Ass'n. v. Nomura Asset Capital Corp.*,
     424 F.3d 195 (2d Cir. 2005) .................................................................................. 20

*Leberman v. John Blair & Co.*,
     880 F.2d 1555 (2d Cir. 1989) ................................................................................ 41

*Lee v. Marvel Enterprises, Inc.*,
     386 F. Supp. 2d 235 (S.D.N.Y. 2005) ................................................................... 19

*Maltz v. Union Carbide Chemicals & Plastics Co.*,
     992 F. Supp. 286 (S.D.N.Y. 1998) ........................................................................ 31

*Metropolitan Life Ins. Co. v. Noble Lowndes Intern., Inc.*,
     84 N.Y. 2d 430 (1994) .......................................................................................... 19

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
     716 F. Supp. 1504 (S.D.N.Y. 1989) ...................................................................... 38

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*,
     910 F. Supp. 913 (S.D.N.Y. 1995) ........................................................................ 44

*National Survival Game, Inc. v. NSG of LI Corp.,*
    565 N.Y.S.2d 127 (N.Y. App. Div. 1991) ...................................................................... 27

*Omni Berkshire Corp. v. Wells Fargo Bank, N.A.,*
    307 F. Supp. 2d 534 (S.D.N.Y. 2004) ............................................................................ 19

*Orr v. Kinderhill Corp.,*
    991 F.2d 31 (2d Cir. 1993) .............................................................................................. 43

*Pepper v. Litton,*
    308 U.S. 295 (1939) ........................................................................................................ 42

*Pittsburgh Terminal Corp. v. Baltimore & Ohio Railroad Co.,*
    680 F.2d 933 (3d Cir. 1982) ...................................................................................... 40, 41

*R.L. Coolsaet Constr. Co. v. Local 150, Int'l Union of Operating Eng'rs,*
    177 F. 3d 648 (7th Cir. 1999) ......................................................................................... 23

*Raleigh v. Illinois Dep't. of Rev.,*
    530 U.S. 15 (2000) .......................................................................................................... 35

*Sauer v. Xerox Corp.,*
    95 F.Supp.2d 125 (S.D.N.Y. 2000) ................................................................................ 38

*Scalisi v. Fund Asset Management, L.P.,*
    380 F.3d 133 (2d Cir. 2004) ............................................................................................. 3

*Senator Linie GMBH & Co. K.G. v. Sunway Line, Inc.,*
    291 F.3d 145 (2d Cir. 2002) ............................................................................................. 3

*Shamis v. Ambassador Factors Corp.,*
    2000 WL 1368049 (S.D.N.Y. Sept. 22, 2000) ............................................................... 37

*Spanos v. Skouras Theatres, Corp.,*
    364 F.2d 161 (2d Cir. 1966) ........................................................................................... 28

*Stein Hall & Co. v. S.S. Concordia Viking,*
    494 F.2d 287 (2d Cir. 1974) ........................................................................................... 27

*Stern v. Gepo Realty Corp.,*
    289 N.Y. 274 (1942) ....................................................................................................... 28

*Thayer v. Dial Indus. Sales, Inc.,*
    85 F. Supp. 2d 263 (S.D.N.Y. 2000) .......................................................................... 30-31

*Tibbetts Contracting Corp. v. O & E Contr. Co.,*
    15 N.Y.2d 324 (1965) ..................................................................................................... 19

*Tradewinds Fin. Corp. v. Refco Sec., Inc.,*
    773 N.Y.S.2d 395 (2004) ................................................................................................ 37

*Travelers Cas. And Sur. Co. of America v. Pacific Gas and Elec. Co.,*
    127 S.Ct. 1199 (2007) ..................................................................................................... 35

*Travelers Int'l, A.G. v. Trans World Airlines, Inc.,*
    41 F.3d 1570 (2d Cir. 1994)................................................................36-37

*United States v. McCombs,*
    30 F.3d 310 (2d Cir. 1994).................................................................... 3

*Van Gemert v. Boeing Co.,*
    520 F.2d 1373 (2d Cir. 1975)................................................................ 40

*VKK Corp. v. Nat'l Football League,*
    244 F.3d 114 (2d Cir. 2001)................................................................. 23

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.,*
    919 F.2d 206 (3d Cir. 1990).................................................................. 48

*Warren v. Union Bank of Rochester,*
    157 N.Y. 259 (1898) ........................................................................... 42

*Wertheim Schroder & Co. v. Avon Prods.,*
    1993 WL 126427 (S.D.N.Y. April 1, 1993) ........................................... 37

*Westmoreland Coal Co. v. Entech, Inc.,*
    100 N.Y. 2d 352 (2003) ...................................................................... 19

## STATUTES

11 U.S.C. § 361 ....................................................................................... 49

11 U.S.C. § 363 ....................................................................................... 49

11 U.S.C. § 364 ....................................................................................... 49

28 U.S.C. §158(a) .................................................................................... 1

Del. Code Ann. § 101(a) ........................................................................... 30

N.Y. Bus. Corp. Law § 202(a)(15) ............................................................. 30

Restatement (Second) of Contracts § 203(a) (1981)..................................... 31

## OTHER AUTHORITIES

1A Wm. Meade Fletcher, <u>Fletcher Cyc. of the Law of Corporations</u> (West
    2006) .............................................................................................. 30

American Bar Foundation, Corporate Debt Financing Project,
    <u>Commentaries on Indentures</u> (1971)................................................... 22

Carl S. Bjerre, <u>Secured Transactions Inside Out: Negative Pledge</u>
    <u>Covenants, Property and Perfection</u>, 84 Cornell L. Rev. 305 (1999) .............. 22

Matthew H. Hurlock, <u>New Approaches to Economic Development: The</u>
    <u>World Bank, the EBRD, and the Negative Pledge Clause</u>, 35 Harv.
    Int'l L.J. 345 (1994)......................................................................... 22

## RULES

Fed. R. of Bank. Proc. 8002.............................................................................................................. 1

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

On May 1, 2007, the United States Bankruptcy Court (Beatty, J.) issued its Memorandum Opinion After Trial, ruling in favor of the debtor Solutia Inc. on the legal and equitable issues presented in the adversary proceeding originally brought by J. P. Morgan Chase, as Indenture Trustee, the predecessor to Plaintiff-Appellant Wilmington Trust (the "Trustee"). (Docket Nos. 146, 148.) On May 17, 2007, the Bankruptcy Court entered a final judgment in favor of Solutia. (Docket No. 147.) The Trustee timely appealed on May 29, 2007. (Docket No. 149.) This Court has jurisdiction under 28 U.S.C. §158(a) and Fed. R. of Bank. Proc. 8002.

## STATEMENT OF THE ISSUES PRESENTED AND STANDARD OF REVIEW

The judgment below rests on the construction of an Indenture, executed on October 1, 1997, between Solutia and the Trustee's predecessor-in-interest, The Chase Manhattan Bank, as trustee. The Trustee's complaint, filed on May 27, 2005, seeks legal and equitable relief based on Solutia's purported desecuritization of claims held by the Trustee under the terms of the Indenture.[1]

The Indenture's express provisions provided various protections for the Trustee's secured claims. Those protections purportedly were eliminated, however, through a sophisticated financing scheme concocted by Solutia and its team of advisors in advance of its bankruptcy filing. The essence of the scheme involved an illusory financing agreement that had no rational business purpose except to strip the Trustee of its secured status.

---

[1]    Prior to filing for bankruptcy, Solutia issued $450 million of debt instruments (known as debentures, but generally referred to as "Notes"). The Notes were issued pursuant to the Indenture, an agreement that provides certain rights and protections to the Trustee, who acts on behalf of the holders of the Notes.

Discovery and trial demonstrated, through overwhelming evidence, that the security stripping scheme breached the Indenture's express terms, breached the covenant of good faith and fair dealing implied in the Indenture, and contravened well-established principles of equity intended to protect those like the Trustee whose rights are lost through manipulation and overreaching.

Yet, in making its ruling below, the Bankruptcy Court ignored the evidence and found, as a matter of law, that the security stripping scheme was not foreclosed by the Indenture's literal terms and therefore could not breach the Indenture. The court then found that its legal conclusion regarding the construction of the Indenture's terms compelled rejection of the Trustee's claim of a breach of the implied covenant of good faith and fair dealing. The court further held that the absence of a breach of the Indenture, as a matter of law, disposed of the Trustee's equitable claims and its request for adequate protection of its liens under the Bankruptcy Code. This appeal accordingly presents the following issues:

1.     Whether the Bankruptcy Court erred in finding as a matter of law that Solutia did not breach the Indenture or the implied covenant of good faith and fair dealing.

2.     Whether the Bankruptcy Court erred as a matter of law in failing to consider whether the Trustee's security should be protected as a matter of equity.

3.     Whether the Bankruptcy Court erred as a matter of law in failing to consider whether the Trustee is entitled to adequate protection of its security.

The Bankruptcy Court's conclusions of law that supported its dismissal of the Trustee's legal and equitable claims are subject to *de novo* review. See In re Smart World Technologies, LLC, 423 F.3d 166, 174 (2d Cir. 2005); In re St. Casimir Dev. Corp., 358 B.R. 24, 35 (S.D.N.Y. 2007). This Court also reviews construction of the Indenture *de novo*. Gil Enters., Inc. v. Delvy, 79 F.3d 241, 245

(2d Cir. 1996) ("review[ing] the district court's construction of contract language de novo" and reversing the district court's holding that letters constituted a "demand" sufficient to give notice as required under the contract); <u>In re Enron Corp</u>., 292 B.R. 507, 510 (S.D.N.Y. 2002) (the district court reviews *de novo* a bankruptcy court's interpretation of contract where "no extrinsic evidence was considered").

The Bankruptcy Court's findings based on its application of an improper legal standard or its mistaken impressions of the applicable rule of law or the legally relevant facts are subject to plenary review by this Court.  <u>See Andrew Crespo Gallery, Inc. v. C.I.R.</u>, 86 F.3d 42, 45-46 (2d Cir. 1996); <u>Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.</u>, 4 F.3d 1103, 1116-17, 1123 (3d Cir. 1993). Indeed, this Court should not hesitate to apply plenary review to the result of a bench trial where, as here, "the result does not jibe with the applicable rule of law." <u>United States v. McCombs</u>, 30 F.3d 310, 316-17 (2d Cir. 1994); <u>Senator Linie GMBH & Co. K.G. v. Sunway Line, Inc.</u>, 291 F.3d 145, 151-52 (2d Cir. 2002) (factual findings of trial court can be set aside where they are the product of an erroneous view of the law).  And where, as here, "a challenge is made to the legal precepts applied by the [lower] court in making a discretionary determination, plenary review of the [lower] court's choice and interpretation of those legal precepts is appropriate."  <u>Scalisi v. Fund Asset Management, L.P.</u>, 380 F.3d 133, 137 (2d Cir. 2004).

Once the Bankruptcy Court made its overarching legal determination that the literal terms of the Indenture did not foreclose Solutia's desecurization scheme, it concluded that neither law nor equity could provide the Trustee with any relief. The Bankruptcy Court's legal conclusions regarding the breach of the Indenture and the relief available are, however, not supportable given the terms of the Indenture, Solutia's conduct, and controlling law.

Even if these breaches go unrecognized, Solutia's scheme – by denying the Trustee the protections of the parties' agreement – breached the covenant of good faith and fair dealing implied in the Indenture.  That claim cannot be by-passed, as the Bankruptcy Court erroneously concluded, based on Solutia's alleged literal compliance with the Indenture.  The Bankruptcy Court also erred in refusing to reach the Trustee's equitable claims simply because it found no breach of the Indenture's terms.  The absence of such a breach does not affect, much less preclude, the availability of equitable relief.  Finally, because the Trustee's secured status should be recognized as a matter of law and/or equity, the Trustee should be accorded adequate protection consistent with the Bankruptcy Code.

## STATEMENT OF THE CASE

**A.     1997:  Solutia Is Formed As A Spin-Off From Monsanto, Inherits Monsanto's Significant Legacy Liabilities, And Obtains $450 Million In Needed Financing Pursuant To An Indenture Agreement**

Solutia was formed in September 1997 as a spin-off of Monsanto Company's chemical division.[2]  In the spin-off, Solutia inherited not only Monsanto's chemical business, but also many of its legacy liabilities, including retiree healthcare and life insurance costs, environmental compliance and remediation costs, and litigation defense costs and judgments.  From Solutia's inception, these legacy liabilities adversely affected its economic performance; Solutia paid roughly $100 million per year just to cover these costs.  (Hunter Trial Testimony, June 13th, p. 11, lns. 7-10.)[3]

---

[2]     This evidence is drawn from the adversary proceeding below and the related bankruptcy proceeding.  The latter record is a proper subject of judicial notice on this appeal.  See Huber v. Marine Midland Bank, 51 F.3d 5, 9 (2d Cir. 1995); First Capital Asset Mgmt. Inc. v. Brickellbush, Inc., 219 F. Supp. 2d 576, 584 (S.D.N.Y. 2002).

[3]     Matters of form:  Citations to trial testimony below will be made by witness and page designation, for example, as follows:  Clausen Trial Testimony, June 16th, p. 87 ln. 9 – p. 88

Continued on following page

One month after its formation, Solutia entered into a trust indenture with The Chase Manhattan Bank, the Trustee's predecessor-in-interest, pursuant to which Solutia issued two series of public debentures:  (a) $150 million in Notes due October 15, 2037; and (b) $300 million in Notes due October 15, 2027.  (See PX 3; PX 73, ¶18.)  The Indenture thus provided $450 million in financing for Solutia's ongoing operations.

Although these Notes originally were issued as unsecured debt obligations, (see PX 73, ¶18), the Indenture provided the Trustee, acting on behalf of the Note holders, with critical safeguards for its $450 million claim.  Several contractual provisions protected the Trustee's interests against subordination to third-party secured claims.  Still other provisions limited Solutia's ability to take actions inimical to the Trustee's interests.

For example, Section 1008 (the "Equal and Ratable Clause") provided that the Trustee's claims became secured if Solutia's secured obligations to third parties exceeded 15 percent of its consolidated net tangible assets.  (See PX 3, § 1008.)  The protection was comprehensive, extending to any kind of third-party loans secured by any kind of security.[4]  Once the clause was triggered, such borrowings

_____

Continued from previous page

ln. 4.  Citations to the Trustee's exhibits will be made as "PX," followed by the exhibit number. For Solutia's exhibits, the designation will be "DX."  Citations to the parties' pleadings will be made by reference to the control number in the court docket, for example, Docket no. 10. Finally, citations to the bankruptcy court proceedings will be made by reference to that docket and respective control number, for example Bankruptcy Docket no. 10.

[4]      More specifically, Section 1008 provides:

> The Company will not . . . create, incur, issue, assume, guarantee or secure any notes, bonds, debentures or other similar evidences of indebtedness for money borrowed . . . secured by any pledge of, or mortgage, lien, encumbrance or security interest on . . . any Principal Property owned or leased by the Company or any Restricted Subsidiary, or on any shares of stock or Debt of any Restricted Subsidiary owned or held by the Company or any other Restricted Subsidiary, without effectively providing that the Securities . . . shall be secured equally and

Continued on following page

could not be undertaken without "effectively" providing the Trustee with security equal and ratable to that granted to Solutia's other secured creditors. (See PX 3, §1008.)

In Section 1009, the protections went further and prohibited Solutia from using sale/leaseback transactions to circumvent the Equal and Ratable Clause. (See PX 3, §1009.) Sections 1010 and 1011 also specified that compliance with Sections 1008 and 1009 could be excused only if Solutia deposited sufficient cash with the Trustee to pay each installment of principal and interest when due or Solutia obtained an express waiver from holders of two-thirds of the Notes. (See PX 3, §§ 1010-11.)

Finally, Sections 102 and 603 of the Indenture provided that Solutia could not require the Trustee to take any action under any provision of the Indenture unless: (1) Solutia gave the Trustee appropriate certifications and legal opinions that Solutia had acted consistently with the "conditions and covenants" of the Indenture; and (2) the Trustee was given the right to investigate whether the requested action in fact complied with the Indenture. (See PX 3, §§ 102, 603.) Because release of the Trustee's liens required prior notice to and action by the Trustee, any such release required compliance with these sections.

---

Continued from previous page

> ratably with (or prior to) such secured Debt . . ., so long as such secured Debt shall be so secured, unless, after giving effect thereto, the aggregate principal amount of all such secured Debt then outstanding plus Attributable Debt of the Company and its Restricted Subsidiaries in respect of sale and leaseback transactions . . . entered into after the date of this Indenture . . . would not exceed an amount equal to 15% of Consolidated Net Tangible Assets [as defined in § 101 of the Indenture]. (See PX 3 at pp. 44-46.)

**B.    2000-2002:  Solutia Experiences Severe Economic Problems, It Requires Additional Financing, And The Trustee's Claims Become Secured Under The Equal And Ratable Clause In The Indenture**

By early 2000, Solutia encountered great difficulty in paying for the legacy liabilities jettisoned by Monsanto.  Its raw material costs had sky-rocketed and it faced significant exposure in environmental litigation involving its facility in Anniston, Alabama.  (See Clausen Trial Testimony, June 16th, p. 13; Ins. 11-22; Hunter Trial Testimony, June 13th, p. 14 ln. 8 – p. 15 ln. 6.)  Things did not improve and, by July of 2002, Solutia had hired an outside financial advisor (Rothschild, Inc.) and restructuring counsel (Kirkland & Ellis) to help plan for bankruptcy contingencies.  (Snyder Trial Testimony, June 19th, pp. 57-58.)

During this period, Solutia and its bank syndicate executed a Second Amended and Restated Credit Agreement, (see PX 74), that extended the maturity of Solutia's 1999 bank loan until August 2004.  (See PX 73, ¶21; see also PX 74.)  As consideration for the extension, Solutia granted its bank syndicate liens on, and security interests in, certain assets.  Solutia and its banks also executed a Sharing Security Agreement and an Intercreditor and Collateral Trust Agreement (together, the "Sharing Security Agreement").[5]  (See PX 73, ¶23; see also PX 4, PX 75.)  The secured debt Solutia incurred in this borrowing exceeded 15 percent of its consolidated net tangible assets and therefore resulted in the grant of equal and ratable liens and security interests to the Trustee on the same basis as Solutia's other secured creditors.  (See PX 73, ¶22.)

---

[5]    While these agreements purported to control the release of all liens on certain collateral, including the Trustee's security (see PX 4, PX 75), the Trustee was not a party to, or involved in negotiation of, the Sharing Security Agreement.  There was no amendment to the provisions of the Indenture and the Trustee's liens therefore could be released only in conformance with the Indenture.

**C.    2003:  As Its Financial Condition Continues To Deteriorate, Solutia Accelerates Its Bankruptcy Planning And Carries Out A Plan To Desecuritize The Trustee's Claims Under The Indenture Prior To An Anticipated Bankruptcy Filing**

Throughout 2003, Solutia's financial woes continued, adversely affecting its ability to refinance its indebtedness or otherwise access capital markets.  (PX 80, p. 1.)  Solutia therefore continued its bankruptcy planning, hiring Gibson Dunn & Crutcher, Sitrick & Company, Inc., Mercer Human Resource Consulting, and Kroll Zolfo Cooper to advise and assist in preparation for a possible chapter 11 filing.  (PX 8 at p. 1; PX 121 at p. 57, lns. 11-13; PX 13; PX 10 at p. 1.)

The key feature of Solutia's bankruptcy planning was a self-described two-stage financing scheme intended to strip the Trustee's liens and security interests.  (See, e.g., PX 69 at pp. 40-43.)  In the first stage, Solutia would replace the 2002 bank syndicate agreement with a new $350 million facility that would be secured by liens *exactly $1,000* below the Equal and Ratable Clause threshold, thereby providing an ostensible basis to release the Trustee's secured claims.  (See PX 103 at pp. 2-3.)  In the second stage, Solutia would file for bankruptcy and roll the pre-petition debt into a new $500 million debtor-in-possession ("DIP") facility with the same lender, secured by blanket liens on all of the collateral that previously had been subject to the Trustee's claims.  (See PX 103 at pp. 2-3.)

Although Solutia's security stripping plan purported to treat stage one and stage two as different transactions, Solutia recognized that it needed the entire $500 million and that stage one alone would accomplish nothing.  Stage one and stage two therefore were presented to lenders as parts of a single plan.[6]  (See, e.g., PX 106 at pp. 1-2.)

---

[6]    If the scheme succeeded, Solutia could grant exclusive liens to secure DIP financing; avoid paying post-petition interest on, or providing adequate protection for, the Trustee's otherwise secured claims; craft a plan without worrying about treating the Trustee as a secured

Continued on following page

In the midst of its bankruptcy planning, on August 20, 2003, Solutia settled the Anniston litigation.  (See DX 19.)  While the settlement was welcome, it did not slow Solutia's bankruptcy planning.[7]  To the contrary, on the same day as the Anniston settlement, Solutia incorporated Solutia Business Enterprises, Inc. ("SBE"), as a wholly-owned subsidiary.  Solutia's bankruptcy counsel formed SBE as a New York corporation.  (See PX 189.)  SBE was formed for the purpose of securing bankruptcy jurisdiction in the Southern District of New York.  (See Snyder Trial Testimony, June 19th, p. 24 ln. 5 – p. 25, ln. 22; see also Docket no. 146, pp. 11 n.8, 13.)

Barely two months after the settlement, on October 8, 2003, Solutia also closed its stage one loan with Ableco.  (See PX 3.)  Because Solutia recognized that stage one provided only $350 million of the needed $500 million, Solutia and Ableco negotiated stage one and stage two simultaneously, (see PX 106; Snyder Trial Testimony, June 9th, p. 17 lns. 8-19), with the understanding that the second stage would be funded in a bankruptcy case.  (See PX 65 at p. 3.)  In an email

_____

Continued from previous page

creditor; and create value that could be used in plan negotiations with Monsanto and others. Indeed, that is exactly what Solutia attempted in its Joint Plan of Reorganization filed on February 14, 2006, (Bankruptcy Docket no. 2855), and subsequent Plans of Reorganization.  If the Trustee's claims were secured, Solutia's pre-petition secured claims would exceed $800 million and Solutia's reorganization plan would fail.  (See PX 184 at p. 6.)

[7]      The resolution of Anniston, at best, simply slowed Solutia's descent into bankruptcy. Less than two months after the settlement, Jeffry Quinn, Solutia's vice-president and general counsel, conceded that, under either recognized test for solvency, Solutia "would be deemed to be insolvent."  (PX 24 at p. 5.)  Two weeks after the settlement, Quinn wrote:

> Since our 10-Q was filed in mid-August, we have lost over $40 million in liquidity from trade creditors.  Our current projections show liquidity reaching dangerously low levels in mid-September.  There are a number of self help options we are currently exploring, but we are facing the very real threat of a liquidity-driven-bankruptcy before having time to pursue these options.

PX 137.

dated September 28, 2003, Ableco's counsel reiterated the two-stage nature of the financing scheme:

> REMEMBER, STAGE II WILL BE IN BANKRUPTCY AND
> THE FEES WILL BE SUBJECT TO OBJECTIONS FROM OTHER
> PARTIES AND BANKRUPTCY COURT APPROVAL

(See PX 48 at p. 2) (capitalization in original).

Had Solutia borrowed the full $500 million in a single step, the Trustee's claims would have remained secured. In order to prevent that from happening, however, Solutia engineered the stage one financing so that Solutia's outstanding secured obligations would fall $1,000 short of the threshold necessary to trigger the Equal and Ratable Clause. (See DX 6, at Security Agreement p. 5; see PX 76 at § 5.01(d)(iii).) From Solutia's perspective, this manipulation of its secured debt would support desecuritization of the Trustee's claims because the Equal and Ratable Clause would no longer be in play. Solutia's chief financing lawyer thus called the loan scheme an "A/B loan/bond desecuritization plan." (See PX 33.) Similarly, Solutia's bankruptcy counsel characterized the stage one financing as the "ABL/'desecuritizing' financing."[8] (See PX 34.)

The stage one loan actually had the effect of *reducing* Solutia's liquidity at a time when liquidity was "dangerously low." (See PX 137.) In its SEC filings, Solutia acknowledged that stage one reduced liquidity by $42 million. (See PX 73 at ¶55.)

In pursuing its desecuritization strategy, Solutia in fact rejected the far less perilous alternative of borrowing under its existing bank facility. Immediately

---

[8]    Several of the lenders that Solutia approached lenders refused to participate in Solutia's two-stage desecuritization scheme. (See PX 40; PX 34.) One lender expressed concern that a bankruptcy judge might view the two stages as "one long step" and not give effect to the desecuritization. (PX 34)

prior to the stage one loan, Solutia had borrowed approximately $249 million of the $300 million available under its 2002 bank syndicate agreement, leaving approximately $51 million available to borrow under that facility.  (See PX 65, p. 1; Clausen Trial Testimony, June 16th, p. 87 ln. 9 – p. 88 ln. 4.)  By comparison, Solutia used the stage one loan to:  pay off the $249 million owed under the 2002 bank syndicate agreement; obtain a $67 million letter-of-credit to replace preexisting secured obligations relating to Astaris LLC ("Astaris");[9] and pay $25 million in transaction expenses, (see Quinn Trial Testimony, May 24th a.m. session, p. 39, lns. 18-23), leaving Solutia with only $9 million in new funds.

 In short, although Solutia could have borrowed an additional $51 million under its existing bank facility, it replaced that facility with the $350 million stage one loan that provided Solutia with only $9 million.  Moreover, had Solutia remained in the 2002 bank facility, it could have increased that facility to $350 million (the size of the stage one loan), thereby creating the ability to borrow $101 million (51 plus 50).  (See PX 47; see also DX 71.)  This approach would have provided more working capital and left the Trustee's security intact.  Solutia chose $9 million over $101 million because its overarching goal was to desecuritize the Trustee.  (See Quinn Trial Testimony, May 24th a.m. session, p. 44 lns. 3-14.)

 In a similar vein, had Solutia written down the value of its assets prior to obtaining the stage one loan, its secured obligations would have exceeded the 15 percent threshold, thereby maintaining the Trustee's secured status.  The conditions for such a write down plainly existed and were required under the

---

[9] In order to skirt the Equal and Ratable Clause, Solutia needed to replace all preexisting secured debt.  (See Docket no. 23 at ¶51.)  This included Solutia's secured guarantee of certain obligations of Astaris LLC, a joint venture between Solutia and FMC Corporation.  (Docket No. 146 at pp. 12-13.)  Solutia used the stage one financing to replace the collateral pledge securing a $67 million contingent obligation to Astaris's lenders with a $67 million secured letter of credit.  (See Bankruptcy Docket no. 23 at ¶¶ 43, 44.)

Indenture and generally accepted accounting principles.  (See PX 3, § 101.)
Solutia had suffered cumulative losses since 2001, including a reported $21 million
loss in operating income for the second quarter of 2003, (see PX 99 at p. 9), and its
own forecasts predicted continued losses.  (See PX 185 at p. 55; PX 108 at p. 5;
PX 99 at p. 9.)  These losses required a write down of certain tax benefit assets –
net operating losses that had value only if Solutia were profitable and the losses
could be used to reduce taxable income.[10]  Solutia did not write down any of its
assets, however, before obtaining the Ableco financing.  Instead, Solutia waited
until December 2003, just two months after the stage one closing, to reduce its
deferred tax benefit assets from $604 million to $24 million based on a "valuation
allowance" of $580 million.  (See PX 185 at p. 64.)

On the day of the stage one loan closing, Solutia purported to release the
Trustee's security.  Rather than sending notice to the Trustee in accordance with
the Indenture, however, Solutia sent a written officer's certification to the collateral
agent under the Sharing Security Agreement and directed the collateral agent to
order release the Trustee's claims.  (See PX 73 at ¶58; PX 78.)

**D.    Solutia's Bankruptcy Filing And The Trial Of The Trustee's Legal And
        Equitable Claims Regarding The Stripping Of Its Security**

Although matters were truly grim, (Bankruptcy Docket no. 2856, pp. 22-24),
Solutia delayed its bankruptcy filing until it could resolve a related issue involving

---

[10]    Solutia justified not taking a write down in the third quarter of 2003 and prior to the
Ableco loan based on:  (1) "the company-prepared long-range plan," and (2) "a number of other
assumptions regarding book/tax differences."  (See PX 108 at p. 3.)  The only evidence Solutia
cited, however, was (a) a ten-year taxable income forecast which details continued losses over
the next four years, and modest gains beginning in 2008, and (b) a Long Range Plan (LRP)
showing expected losses through 2005 and no data beyond 2005.  (See PX 108 at pp. 5, 7-8.)

the so-called Euro Notes, issued by Solutia's Belgian affiliate and guaranteed by Solutia.[11]

On December 17, 2003, Solutia, SBE, and thirteen related entities filed voluntary petitions for relief under Chapter 11 in the Southern District of New York. (See PX 73, ¶13.) Solutia also filed 19 first-day motions, including one seeking immediate approval for the stage two DIP financing. (See PX 73, ¶70.) In connection with this motion, Solutia maintained that the stage one loan desecuritized the Trustee's claims and that the bankruptcy filing effectively precluded the Trustee from asserting a security interest in any of Solutia's assets. (See PX 73, ¶71.)

Solutia's motion to approve the stage two financing laid to rest any argument that the stage one loan was a stand-alone transaction. After admitting that its preexisting financing was patently, even dangerously, inadequate (see PX 180 at ¶15; see also Bankruptcy Docket no. 171 at ¶15), Solutia explained that a "liquidity crisis" left it and its subsidiaries with "virtually no available cash to meet the ongoing obligations that they must incur to run their businesses," and that failure to approve stage two would force them "to cease or sharply curtail operations of some of all of their businesses. . . ." (See PX 180 at ¶18; see also Bankruptcy Docket no. 171 at ¶ 18.)

---

[11]    The final step in Solutia's bankruptcy planning was to "de-link" these Euro Notes from Solutia. (See PX 146.) Without that de-linking, a chapter 11 filing be a default under the Euro Notes and result in liquidation of assets in Europe under Belgian insolvency laws. (See PX 91 at p. 2-3; PX 92 at pp. 2-4.) At its December 16, 2005 meeting, Solutia's Board was advised that the Euro Notes had agreed to accept liens on substantially all assets of Solutia Europe S.A./N.V. in exchange for a release of Solutia's guarantee. (See PX 184 at p. 75.) With this agreement, the Board formally approved Solutia's bankruptcy filing. (See PX 92 at p. 4; see also Docket no. 146, pp. 18-19.)

The Trustee investigated the circumstances behind the Ableco financing and filed this adversary proceeding on May 27, 2005.  Following extensive discovery, trial began on May 23, 2007.  Relying largely on documentary evidence and oral testimony from Solutia's corporate officers, financial advisors, and bankruptcy lawyers, the Trustee established that:

- the stage one loan breached several provisions in the Indenture that protected the Trustee's security (including the Equal and Ratable Clause);

- Solutia's attempted release of the Trustee's security was ineffective because it did not comply with the Indenture;

- Solutia's attempt to defend its release of the Trustee's security by taking refuge in the Sharing Security Agreement was ineffective because the Trustee was not a party to that agreement and Solutia's prior "corporate actions in furtherance of bankruptcy" precluded reliance on that agreement; and

- the stage two loan itself triggered the Indenture's Equal and Ratable Clause, thereby securing the Trustee's claims notwithstanding the bankruptcy filing.

The Trustee also established that, even if Solutia's desecuritization scheme were not foreclosed by the Indenture's express terms, Solutia breached the covenant of good faith and fair dealing implied in the Indenture.  Solutia conceived of this scheme for the express purpose of stripping the Trustee's security and making sure that the Trustee could not reassert its secured status.  It delayed the write-down of its assets for those same reasons.  Each step was intended to deny the Trustee the benefits of the Indenture's provisions protecting its security from being subordinated to other secured creditors.

-14-

The Trustee independently demonstrated that its secured status should be preserved as a matter of equity. Controlling equitable principles, and the case law setting forth those principles, supported treating the stage one and stage two loans as a single transaction, precisely the way Solutia and its advisors conceived it. The artifice of the lien stripping scheme therefore should be disregarded and the status quo – with the Trustee's claims secured – should be maintained.

Although unreflected in its later ruling, the Bankruptcy Court expressed skepticism on many of Solutia's arguments during the trial. For example:

- The court agreed that Solutia deliberately attempted to defeat the Equal and Ratable Clause, (Trial Transcript, June 7th at pp. 83-84), and characterized Solutia's actions as "highly cute." (Trial Transcript, July 10th at p. 151.)

- In response to Solutia's claim that the Indenture gave it the unfettered right to effect a release of the Trustee's liens, the court said: "The contract in no way suggests that you have a deliberate right to lower the amount of your secured debt in order to get rid of the equal and ratable liens." (Trial Transcript, June 7th, p. 88, lns. 14-25.)

- The court likewise questioned the legitimacy of the stage one Ableco financing as a stand-alone financing because, "that agreement did not provide [Solutia] with more money, it gave you less money. It wasn't a good loan, and you just entered into it in order to get them out of equal and ratable. Because you plainly needed another 150 million." (Trial Transcript, May 31st at p. 154, lns. 20-24.)

- Responding to the suggestion that Solutia hoped to avoid bankruptcy, the court said it was "mystified by the belief that [Solutia] could avoid

bankruptcy considering the financial condition that [Solutia] was in."
(Trial Transcript, June 13th at p. 55, lns. 14-20.)

- Responding to Solutia's argument that the Trustee's liens could be released pursuant to the Sharing Security Agreement, even though the Trustee was not a party to the that agreement, the court observed, "[i]sn't the most interesting question about [that agreement] whether or not Solutia had the right to enter into this document without the signatures of the note parties;" "It's sort of like, you know, punched them in the stomach and you didn't even ask them." (Trial Transcript, May 24th p.m. session, p. 60, lns. 1-11.)

The trial concluded on July 10, 2006 after fourteen days of testimony and two days of closing arguments. The parties filed post-trial briefs on August 9, 2006. (Docket nos. 123, 127, 129, 131.) On May 1, 2007, the Bankruptcy Court issued its opinion. (Docket no. 146.) Looking solely at the terms of the Equal and Ratable Clause, the court held: "Noteholders do not have, and are not entitled to, an Equal and Ratable Lien on any of [Solutia's] assets [and] the Notes were properly de-securitized under the express terms of the Indenture and its related agreements." (Id. at p. 3.) Having held that the clause did not foreclose Solutia's desecuritization scheme, the court then held that the covenant of good faith and fair dealing was not relevant in resolving the Trustee's claims. (Id. at p. 22.)

The Bankruptcy Court also found that the Trustee's secured claims could be released pursuant to the Sharing Security Agreement because the Trustee was "an intended beneficiary" of the agreement. (Id. at p. 6, n.5.) No legal authority was cited to support this proposition. On the issue of whether Solutia had engaged in corporate action in furtherance of bankruptcy, thereby precluding any release of the Trustee's claims under the Sharing Security Agreement, the court held that

nothing short of a formal board resolution authorizing the filing of a bankruptcy petition could be equated with "corporate action in furtherance of bankruptcy." (Id. at pp. 28-29.) Thus, it treated Solutia's elaborate bankruptcy planning as irrelevant, including the establishment of a subsidiary (SBE) solely for purposes of obtaining bankruptcy jurisdiction in New York. (Id. at p. 11, n.8.)

Finally, the court opined that the two steps in the Ableco financing scheme should be treated as separate transactions because Solutia approached them that way for business purposes. (Id. at pp. 11-12.) In making that finding, however, the court did not consider the Trustee's argument that the two loans should be treated as one overall transaction as a matter of equity or the Trustee's separate argument for imposition of equitable liens.

## SUMMARY OF ARGUMENT AND RELIEF REQUESTED

This Court's intervention is needed to rectify the manifest injustice sanctioned by the lower court's ruling. The Bankruptcy Court's opinion reflects multiple errors in its treatment of the Trustee's legal and equitable claims. These errors extend to the legal principles the court applied or did not apply, and the findings and conclusions that follow those misapplications or misperceptions of the controlling law. The record shows that Solutia's security stripping scheme, robbing the Trustee of the Indenture's protections:

- breached the Indenture's express terms;
- breached the covenant of good faith and fair dealing implied in the Indenture; and
- must be rejected as a matter of equity.

The Trustee urges this Court to reverse the Bankruptcy Court's legal conclusion on breach of contract and hold that the Trustee's claims should be secured on an equal and ratable basis with Solutia's other secured creditors. The

Court should reach the same result based on Solutia's breach of the implied covenant or, at the very least, remand this issue with direction to the Bankruptcy Court to consider such a breach in light of the controlling law. Separately, the Trustee urges the Court to declare that its claims should be secured as a matter of equity or, at the very least, remand this issue to the Bankruptcy Court with direction to consider the Trustee's equitable claims under the controlling principles applicable to those claims. The same conclusion should be reached on the Trustee's request for adequate protection under the Bankruptcy Code.

## ARGUMENT

### A.    Solutia's Scheme To Desecuritize The Trustee's Claims Breached The Indenture's Express Terms

At trial, the Trustee proved four breaches of the Indenture, any one of which warrants restoring the Trustee's secured status. *First*, contrary to the Bankruptcy Court's holding, when the purpose of the Indenture is considered in light of the parties' entire agreement, Solutia's desecuritization scheme breached the Indenture's express terms. *Second*, contrary to the Bankruptcy Court's holding, Solutia's attempt to release the security for the Trustee's claims was ineffectual under the Indenture or the Sharing Security Agreement. *Third*, although unaddressed by the Bankruptcy Court, Solutia's failure to timely write down its assets is a breach of the Indenture. *Fourth*, although also unaddressed, Solutia's refusal to acknowledge that the blanket liens granted in the stage two financing triggered the Equal and Ratable Clause was a breach of the Indenture.

The Bankruptcy Court resolved the Trustee's breach of contract claims by looking solely at the Equal and Ratable Clause in isolation. In the court's view, that was the only provision in the Indenture that contained a "financial covenant" running in favor of the Trustee. (Docket 146 at p. 26.) But that clause is by no

means the only "financial covenant" running in the Trustee's favor.  And, in any event, a court's role in construing a contract, and determining the meaning of any of its provisions, cannot be focused so narrowly.  Rather, under New York law, "[a] contract should be construed in light of its objective, and should not be read in a fashion that defeats its purpose."  Lee v. Marvel Enterprises, Inc., 386 F. Supp. 2d 235, 244 (S.D.N.Y. 2005) (citation omitted).  Rather, a contract should be "read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." Westmoreland Coal Co. v. Entech, Inc., 100 N.Y. 2d 352, 358 (2003).  In the final analysis, therefore, "the key to contract interpretation is 'the parties' reasonable expectations.'"  Omni Berkshire Corp. v. Wells Fargo Bank, N.A., 307 F. Supp. 2d 534, 539 (S.D.N.Y. 2004) (citations omitted).

Moreover, "[a] court will endeavor to give the [contract a] construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other."  Metropolitan Life Ins. Co. v. Noble Lowndes Intern., Inc., 84 N.Y. 2d 430, 438 (1994) (quoting Fleischman v. Furgueson, 223 N.Y. 235, 241 (1918)).  Where "two sophisticated business entities" dispute the meaning of a contract, New York courts eschew any interpretation that would effect "a harshly uneven allocation of economic power" as between the two parties.  Id.  Indeed, "'[l]anguage in contracts placing one party at the mercy of the other is not favored by the courts.'"  Id. (quoting Tibbetts Contracting Corp. v. O & E Contr. Co., 15 N.Y.2d 324, 337 (1965)) (other citations omitted); see also Lee, 386 F. Supp. 2d at 244 ("[a] chief objective of interpretation is 'to avoid a result which places one party at the mercy of the other.'") (citation omitted).

Finally, once the contract's purpose and the relevant circumstances are considered, the principles governing construction are well-established:  "In

interpreting a contract under New York law, 'words and phrases . . . should be given their plain meaning[.]'" <u>LaSalle Bank Nat'l Ass'n. v. Nomura Asset Capital Corp.</u>, 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).  "The court should 'construe the agreements so as to give full meaning and effect to the material provisions.'" <u>Beal Sav. Bank v. Sommer</u>, 8 N.Y.3d 318, 324 (2007) (citations omitted); <u>see</u> <u>also</u> <u>LaSalle Bank Nat'l Ass'n.</u>, 424 F.3d at 206 ("contract 'should be construed so as to give full meaning and effect to all of its provisions'") (citation omitted).

     As these authorities make clear, the Bankruptcy Court's narrow focus on the Equal and Ratable Clause was a legal misstep from its inception.  What the court labeled as the Indenture's "plain meaning," as a matter of law, cannot be arrived at in the manner the court chose.  This error alone warrants reversal.  Further, when the purpose and intent of the Indenture are determined, as they must be, from all its relevant provisions, a different result than the one reached below obtains as well.

### 1.    Solutia's Security Stripping Scheme Violated The Express Terms Of The Indenture That Are Intended To Protect The Trustee

     Immediately before Solutia implemented the Ableco financing scheme, the Trustee's claims already were secured.  The Trustee's right to repayment accordingly was protected on the same basis as Solutia's other secured creditors.  Because the Trustee's claims were secured, moreover, the Equal and Ratable Clause (Section 1008) plainly cannot be read in isolation for purposes of determining the parties' intent with respect to maintaining the Trustee's secured status.[12]

---

[12]     In its opinion after trial, the Bankruptcy Court characterized the Trustee's construction of Section 1008 as providing protection for the noteholders in the event of a slide into bankruptcy. The court considered that construction to be a misreading of the Indenture.  (Docket No. 146 at p. 13.)  That is not, however, the construction urged.  Rather, the Equal and Ratable Clause,

Continued on following page

For example, Sections 102 and 603 apply when Solutia seeks to require the Trustee to take action under the Indenture.  Because nothing in the Indenture gave Solutia the power to execute releases of liens, any release of the Trustee's liens required action by the Trustee.  Under Sections 102 and 603, before Solutia could require such action, Solutia had to supply the Trustee with certificates of compliance with the Indenture's covenants and conditions and then give the Trustee the opportunity to investigate that compliance.  Although these provisions are directly implicated as far as the security stripping is concerned, Solutia did not comply and the Trustee therefore did not release its liens.

Similarly, Section 1009 (prohibiting the use of a sale/leaseback as a means to evade Section 1008) and Sections 1010 and 1011 (setting forth the only avenues for excusing compliance with Sections 1008 and 1009) both provide safeguards for the Trustee's security.  Although highlighted by the Trustee, none of these provisions was considered by the court below.  Yet, when Section 1008's own terms are read in combination with these provisions, they evoke an intent to provide the Trustee with substantial protection from subordination of its secured claims.[13]

As noted, the language and breadth of Section 1008 itself highlights this basic purpose.  The Equal and Ratable Clause extends to *any* action ("create, incur,

_____

Continued from previous page

along with other provisions of the Indenture, protects the Trustee from being subordinated to the claims of third-party secured creditors.  It is that contractual protection that the desecuritization scheme breached here.

[13]    Section 801 of the Indenture provides similar protections in the context of a merger or conveyance or lease of substantially all assets.  Before taking such a step, Solutia had to deliver to the Trustee a certificate and opinion that all conditions precedent to such a transaction under the Indenture has been met.  (See PX 3, § 801.)  Under Section 802, the Trustee's interests were expressly protected in the event such a merger or consolidation, including, as appropriate, by equal and ratable security.  (See PX 3, § 802.)

issue, assume, guarantee or secure") involving *any* type of indebtedness ("any
notes, bonds, debentures or other similar evidences of indebtedness for money
borrowed") secured by *any* type of lien or security interest ("secured by any pledge
of, or mortgage, lien, encumbrance or security interest").  The grant of liens above
the 15 percent threshold effects an immediate grant of equal and ratable security.
By describing broadly the range of actions and security mechanisms triggering the
Trustee's rights, the drafters left no doubt that Section 1008 encompassed any type
of conduct that, but for the grant of equal and ratable liens to the Trustee, could
leave the Trustee's claims subordinated to substantial claims of other lenders.

     In that fashion, the purpose of the Equal and Ratable Clause is to put the
Trustee on the same footing as other secured creditors.  Such a clause is intended
to:

> make as certain as practicable that no other creditors have a right . . . to
> enforce a prior lien or other prior encumbrance, and that in the event of
> bankruptcy, the amount of secured debt, if any, will not be such as to deprive
> the unsecured debenture holders of full participation in the liquidation or
> reorganization.

American Bar Foundation, Corporate Debt Financing Project, Commentaries on
Indentures, § 10-10 at 354 (1971); see also Matthew H. Hurlock, New Approaches
to Economic Development: The World Bank, the EBRD, and the Negative Pledge
Clause, 35 Harv. Int'l L.J. 345, 347 (1994) ("[n]egative pledge clauses appear in
loan agreements in lieu of a grant of security, providing comfort to the unsecured
lender that 'the commercial decision it has reached to lend money to a borrower
with certain current and projected assets will not be materially changed by the
borrower granting rights to those assets to other creditors'"); Carl S. Bjerre,
Secured Transactions Inside Out: Negative Pledge Covenants, Property and
Perfection, 84 Cornell L. Rev. 305, 311 (1999) (internal footnotes omitted) (the

negative pledge covenant is "intended as protection against later secured borrowings").

To remove any possible doubt as to its protective function, Section 1008 goes further and states that the Trustee must be provided with equal rights "effectively." "[T]he ordinary meaning of 'effective' connotes actual ability to achieve a result," as opposed to mere authorization or initiation of an action. Four Points Shipping & Trading, Inc. v. Poloron Israel, L.P., 846 F. Supp. 1184, 1187 (S.D.N.Y. 1994). In the present case, this means that the Trustee's security for its claims must be more than colorable; it must achieve the result of safeguarding the Trustee's interests on the same footing as Solutia's other secured creditors.[14]

The exceptions set forth in subsections (a) through (l) of Section 1008 further confirm a basic purpose to protect the Trustee's claims once secured. These exceptions apply *only* to transactions that would *not* result in subordination of the Trustee's claims to large secured claims of a competing creditor. (See PX 3.) In such circumstances, additional exceptions should not to be implied, see Batchelder v. Council Grover Water Co., 131 N.Y. 42, 46 (1892) (construing the exclusivity of the default provisions in an indenture), and nowhere among the exceptions is Solutia permitted to circumvent the Equal and Ratable Clause through the artifice of the security stripping scheme in which it engaged.[15]

---

[14]    In its opening brief, the *Ad Hoc* Committee of Solutia Noteholders states that Section 1008 does not provide for the automatic creation or release of liens. While the Trustee believes the Equal and Ratable Clause provides a self-executing grant of liens, this is a distinction without a difference because Solutia admittedly created liens under Section 1008 and in any event Section 1008 does not provide for the automatic release of liens.

[15]    Batchelder reflects a well-settled rule of construction. See R.L. Coolsaet Constr. Co. v. Local 150, Int'l Union of Operating Eng'rs, 177 F.3d 648, 658-69 (7th Cir. 1999); see also VKK Corp. v. Nat'l Football League, 244 F.3d 114, 130 (2d Cir. 2001) (applying the principle *expressio unius est exclusio alterius*, where sophisticated parties expressly referenced certain events the Court will not imply the inclusion of others); IBM Poughkeepsie Employees Fed'l Credit Union v. Cumis Ins. Soc., Inc., 590 F. Supp. 769, 773 (S.D.N.Y. 1984) ("when certain
Continued on following page

Further confirmation of this same essential purpose comes from Section 1009. As discussed in the Prospectus issued by Solutia in connection with sale of the notes, the Indenture contained a series of covenants intended to prevent subordination to substantial claims of others.[16] (See PX 81.) Section 1009 prohibits use of a sale/leaseback as a means to evade the Equal and Ratable Clause and this prohibition is supportive of an intention to protect the Trustee's secured status from off-balance sheet transactions that might otherwise circumvent Section 1008.

Still further support comes from Sections 1010 and 1011, which provide the only means to avoid compliance with the restrictive covenants set forth in Sections 1008 and 1009. These sections, too, evince an intent to protect the effectiveness of the Trustee's security. Section 1010 excused compliance with these sections *only* if Solutia gave the Trustee a cash deposit securing timely payment of the Notes, together with an Officers' Certificate and an Opinion of Counsel stating that Solutia had satisfied all conditions of Section 1010. (See PX 3 at § 1010.) Section 1011 permitted Solutia to "omit" compliance with Sections 1008 or 1009 if the Holders of at least 66 2/3% in principal of the Notes waived such compliance, but any such waiver became effective only if "expressly waived" and until then Solutia's obligations "remain[ed] in full force and effect." (See PX 3 at § 1011.) Solutia never posted a deposit and never requested such a waiver, presumably

---

Continued from previous page

persons or categories are specified in a contract, an intention to exclude all others may be inferred").

[16]    While the Prospectus contained an extensive list of "Risk Factors" to be considered by investors, nowhere did Solutia suggest a risk that holders might be deprived of their liens when they needed them most.

because it did not want those Holders to direct the Trustee to exercise remedies prior to the bankruptcy filing and the stage two loan.[17]

    In sum, fair consideration of all the relevant provisions of the Indenture, in context, provides a different perspective on the parties' bargain than the one constructed by the Bankruptcy Court.  It would do considerable violence to the intent behind these provisions to construe them to permit Solutia to manipulate its borrowings for the express purpose of rendering the Equal and Ratable Clause ineffective in protecting the Trustee.  That is not a recognized goal of New York's principles of contract construction.

    Solutia's scheme also contravened the rule that a party to a contract may not do indirectly what it may not do directly.  In Elka Educators, Inc. v. Sidrian Educators, Ltd., 77 Civ. 2993-CLB, 1977 U.S. Dist. LEXIS 14969, *32 (S.D.N.Y. July 15, 1977), the defendant licensee engaged in a "sham" agreement for the purpose of circumventing its obligation to pay royalties to the plaintiff licensor.  The court noted that "a circus owner can dress a monkey up to look like a man, but can't hide his tail."  Id.; see also Delta Truck & Tractor Inc. v. J.I. Case Co., 975 F.2d 1192, 1203 (5th Cir. 1992) (attempts to "disguise the effect of the transaction and avoid the troublesome provisions of the dealer agreements," so as to "do indirectly what they could not do directly," breached contract with plaintiff); Century Marine Inc. v. United States, 153 F. 3d 225, 230 (5th Cir. 1998) (plaintiff

---

[17]    Although Solutia had identified its principal bondholders, it made no effort to contact them or the Trustee with regard to this scheme.  (PX 70; Snyder Trial Testimony, June 19th, p. 45 ln. 22 – p. 48 ln. 23.)  The concept that the Trustee and its holders are entitled to notice before Solutia takes action affecting their rights is evidenced throughout the Indenture.  In addition to Sections 102, 603, and 1011, referenced above, see Section 902 (supermajority consent required for supplemental indenture modifying holders' rights); Section 1002 (notice required with regard to any failure to comply with covenants); Sections 1102 and 1104 (notice of redemption of securities).

could not "do indirectly what it could not do directly" under terms of a government contract).

The Bankruptcy Court's opinion benignly described Solutia as borrowing "an amount" below the threshold thereby avoiding the Equal and Ratable Clause (Docket No. 146 at p. 2), but failed note that this amount – just $1,000 less – was pegged specifically to circumvent the purpose of the clause. This desecuritization scheme is the antithesis of an "effective" securing of the Trustee's claims on the same footing as other secured creditors. Nor can the desecuritization scheme be squared with the related contractual terms that excuse compliance with the Equal and Ratable Clause only in very limited circumstances. Solutia's desecuritization scheme accordingly should be perceived for what it is – a breach of the Indenture's express terms. The result below should be reversed and the Trustee's secured status should be maintained for this reason alone.

### 2. Solutia's Attempted Release Of The Trustee's Security Breached The Indenture's Express Provisions Controlling The Release Of That Security

Solutia's attempted release of the Trustee's security also breached the Indenture. Solutia contended in its closing argument that, because the Trustee was not a party to the Sharing Security Agreement, the Trustee's rights were limited to those established in the Indenture. (See Debtor's Closing Argument, July 10th, p. 115 lns. 9-13.) Ironically perhaps, the Bankruptcy Court, without any supporting legal analysis, rejected Solutia's argument and concluded that the Trustee was an "intended beneficiary" of the Sharing Security Agreement, (Docket no. 146 at p. 6, n.5), and, therefore, was bound by its terms – even though the Trustee was not a party to that agreement and had not been involved in its negotiation. The court then found that, because Solutia's attempted release of the Trustee's security

complied with the Sharing Security Agreement, the release of the security should be upheld.

The Bankruptcy Court's conclusion, however, is indefensible for either of two reasons. First, because the Trustee is not a party to the Sharing Security Agreement, that agreement cannot displace or supersede Trustee's rights under the Indenture. Second, even if the Sharing Security Agreement somehow is controlling, Solutia's attempted release of the Trustee's liens failed to comply with the agreement, too.

Looking first at the court's "intended beneficiary" holding, an agreement between third parties, executed five years after the Indenture, cannot limit the Trustee's rights under the Indenture. Indeed, the notion that an agreement between third parties could be used to deprive a creditor of essential rights under a bargained for agreement would turn contract law on its head. Whether Solutia and the parties to the Sharing Security Agreement intended to affect the Trustee's rights is beside the point. Their ancillary agreement cannot provide Solutia with the unfettered right to breach the Indenture. Stein Hall & Co. v. S.S. Concordia Viking, 494 F.2d 287, 291 (2d Cir. 1974) (third parties may make a non-party a beneficiary of their agreement, but they cannot contract to bind it to their agreement); see National Survival Game, Inc. v. NSG of LI Corp., 565 N.Y.S.2d 127, 128 (N.Y. App. Div. 1991) (affirming that, because defendants were not parties to a non-compete agreement, "they cannot be bound by it").[18]

_____

[18]    See also International Customs Assocs., Inc. v. Ford Motor Co., 893 F. Supp. 1251 (S.D.N.Y. 1995) (holding "a contract cannot bind a non-party," and "[t]he status of an intended third-party beneficiary gives that person the right to sue; it does not give others the right to sue that person on the contract"), aff'd, 201 F.3d 431 (2d Cir. 1999); Interallianz Bank AG v. Nycal Corp., 1995 WL 406112, *4, n.4 (S.D.N.Y. July 7, 1995) (holding "[a] stranger to an express contract incurs no liability under the contract, regardless of whether he receives any benefits thereunder" and warning plaintiff, who argued that a third party beneficiary might be liable

Continued on following page

Accordingly, the terms of the Indenture, not the Shared Security Agreement, control the manner in which the Trustee's security can be released. Because Solutia indisputably did not comply with the Indenture, its attempted release of the security is ineffective. As explained above, to effect such a release consistent with Sections 102 and 603, Solutia had to supply the Trustee with the appropriate certificates and opinions that the release conformed to all the conditions and covenants in the Indenture, and further to permit the Trustee to investigate the substance of the certificates and opinions before taking the requested action. Solutia did not comply with any of these steps. Its failure to comply, moreover, was hardly inconsequential. If the Trustee had the opportunity to investigate the Ableco financing agreement, it could have raised questions about the loan transaction and acted to protect its rights.

In any event, by virtue of Solutia's non-compliance, the Trustee's secured status remains in place on the same basis as Solutia's other secured creditors. Solutia cannot use its failure to act to frustrate the purposes of the Indenture. Spanos v. Skouras Theatres, Corp., 364 F.2d 161, 169 (2d Cir. 1966) (*en banc*); see Stern v. Gepo Realty Corp., 289 N.Y. 274, 277 (1942) (party who defaults on its own contractual obligation cannot take advantage of that failure).

Even assuming the Sharing Security Agreement governed release of the Trustee's liens, Solutia's attempted release was ineffective under that agreement as well. That agreement provided that, where a "Triggering Event" had occurred, liens could not be released without approval of the holders of the Notes. (See PX 75 at § 5.12.) Thus, if a "Triggering Event" occurred, Solutia could not divest the

_____

Continued from previous page

under the contract, to "consider Rule 11(b)(2) of the Federal Rules of Civil Procedure carefully in any future submissions").

Trustee's security without the noteholders' approval.  Here, there is no dispute that no such approval was sought.  The only question, then, is whether the Bankruptcy Court erred in finding that no "Triggering Event" occurred.  It did.

"Triggering Events" include "the taking of corporate action by the Company in furtherance of [a bankruptcy filing]" and any corporate action to authorize a bankruptcy filing.[19]  Solutia clearly took "action in furtherance of a bankruptcy" in the months leading up to the implementation of its desecuritization scheme and its actual bankruptcy filing.  For well over a year, Solutia formulated bankruptcy contingency plans.  Its officers and in-house counsel met regularly to discuss and refine those plans.  As the company's financial condition continued to deteriorate, theoretical discussions became an action plan, vetted and approved by Solutia's officers who oversaw the plan's implementation.  To that end, Solutia engaged bankruptcy counsel and financial advisors to assist it in developing its lien stripping financing agreements, negotiating and planning for DIP financing, and drafting its barrage of first day pleadings.  These actions,without more, constituted a Triggering Event under the Sharing Security Agreement.

Any lingering doubt as to whether Solutia engaged in corporate action in furtherance of bankruptcy is laid to rest by Solutia's formation of SBE, a wholly-owned shell corporation in New York, for the sole purpose of establishing venue in New York bankruptcy court.  (See Docket no. 146 at pp. 11, n.8, 13.)  At trial, the Bankruptcy Court observed that incorporation of SBE "technically" was corporate action and "the board was advised of it."  (Id. at p. 29; see also Debtor's Closing

---

[19]    More specifically, "Triggering Events" include an "Event of Default" under the Indenture and a "Bankruptcy Event" with respect to the debtor.  (See PX 4 at § 1(a), and §7.02(b).) "Events of Default" under the Indenture include "the taking of corporate action by the Company in furtherance of [a bankruptcy filing]."  (See PX 3 at § 501(6).)  "Bankruptcy Events" include any corporate action to authorize a bankruptcy filing.  (Id. at § 1(a), p. 3 (emphasis added).)

Argument, July 10th, p. 126 ln. 9 – p. 127 ln. 6.)  Indeed, formation of a subsidiary corporation, by authorized representatives of the corporation acting pursuant to statute, is the quintessential "corporate action."  See, e.g., Del. Code Ann. Section 101(a) ("[a]ny . . . corporation, singly or jointly with others, . . . may incorporate or organize a corporation"); N.Y. Bus. Corp. Law Section 202(a)(15) (corporations have the power "to the extent permitted in any other jurisdiction to be an incorporator of other corporations of any type or kind"); 1A Wm. Meade Fletcher, Fletcher Cyc. of the Law of Corporations, § 85 (West 2006).

In its opinion, however, the Bankruptcy Court ignored its findings at trial and held that only a formal board resolution authorizing the filing of a bankruptcy petition constitutes a Triggering Event.[20]  But that narrow construction is not defensible in light of the language of the Sharing Security Agreement, prohibiting a release if Solutia took either (i) "corporate action to authorize" a bankruptcy filing or (ii) "corporate action in furtherance" of a bankruptcy petition.  First, reading the words "corporate action" to apply only to action taken by the board of directors would ignore "black-letter law" that a corporation acts "through its officers, directors and employees.'"  Thayer v. Dial Indus. Sales, Inc., 85 F. Supp.

---

[20]    Judge Beatty based this conclusion on her decision twenty years earlier in In re Revere Copper and Brass, Inc., 60 B.R. 887 (Bankr. S.D.N.Y. 1985).  The court took the position that, because so few cases had been decided on the issue since Revere, Revere presumptively must set forth the controlling rule.  (Docket 146 at p. 28.)  The dearth of authority, however, does not establish its correctness and certainly does not determine its applicability on the facts of this case.  Revere did not involve a similar fact pattern, nor could its holding be relied on to displace either the actual language of the Sharing Security Agreement or principles of construction requiring that effect be given to all its terms.  Revere likewise did not discuss the types or quantity of actions that would be sufficient to constitute corporate action in furtherance of bankruptcy, but merely stated that under the circumstances in the case "[c]ontingency planning and discussions prior thereto [did] not rise to the level of corporate action."  Revere, 60 B.R. at 891.  Not surprisingly, then, Solutia's bankruptcy counsel warned that Revere did not "directly discuss" a transaction involving such extensive bankruptcy planning activities like those that occurred here.  (See PX 77 at p. 5.)

2d 263, 270 (S.D.N.Y. 2000) (quoting Maltz v. Union Carbide Chemicals & Plastics Co., 992 F. Supp. 286, 305 (S.D.N.Y. 1998)).  Reading "corporate action" to exclude all actions authorized or supervised by corporate representatives would deprive those words of any meaning, in contravention of settled rules of construction.  See Restatement (Second) of Contracts § 203(a) (1981).[21]

Second, the court's "board resolution" approach completely disregards the broader test of action "in furtherance" of bankruptcy set forth in the agreement. For the latter words to have meaning, they must signify something more than the ultimate adoption of a board resolution approving a filing.  Again, contracts should not be construed in a manner that renders their terms superfluous.

Solutia's extensive efforts to promote and advance its plans for bankruptcy fit squarely within the Triggering Event language in Sharing Security Agreement. Even if that agreement somehow could be viewed as controlling, the Trustee's liens could not be released without its approval.  Since no approval was sought or obtained, the Trustee's secured status remains on the same footing as Solutia's other secured creditors.

---

[21]     See also International Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous"); Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Mach. Local 550, 167 F.3d 764 (2d Cir. 1999) (court prefers giving "reasonable and effective meaning" to all contractual terms) (citation omitted); Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992 ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible") (citation omitted); American Home Assurance Co. v. Baltimore Gas & Elec. Co., 845 F.2d 48, 52 (2d Cir. 1988) (same).

3.    **Solutia's Accounting Manipulation In Failing To Write Down Its Asset Valuation Before The Stage One Loan Breached The Indenture's Express Terms**

The Bankruptcy Court never considered the Trustee's independent argument that, under generally accepted accounting principles, the secured debt incurred in stage one exceeded the 15 percent threshold and therefore maintained the Trustee's right to equal and ratable security. Yet, this result also follows from the Indenture's terms as applied to undisputed facts regarding Solutia's financial condition.

The Equal and Ratable Clause is keyed to Solutia's consolidated net tangible assets, as determined using Generally Accepted Accounting Practices ("GAAP") and standards established by the Financial Accounting Standards Board ("FASB"). (See PX 3 at §§ 101, 1008.) In accordance with these standards, Solutia adopted FASB's Statement of Financial Accounting Standards No. 109 ("FAS 109"). (See PX 185 at p. 50.) On October 8, 2003, giving effect to the stage one loan, Solutia's outstanding secured obligations totaled $269.1 million. (See PX 76 at § 5.01(d)(xvii).) Therefore, for Solutia to avoid triggering the Equal and Ratable Clause at the time of the stage one loan, its consolidated net tangible assets had to equal or exceed $1794 million (*i.e.*, $269.1 \div 0.15$) – *as determined under GAAP*. While Solutia claimed to have assets in excess of this amount on October 8, 2007, this assertion was inconsistent with GAAP.

To understand why Solutia's asset valuation falls short, it is important to remember that on December 31, 2003 – barely two months after it closed the stage one loan – Solutia reported a $580 million reduction in net operating losses and other deferred tax benefit assets because it "no longer believed" that such assets could be recognized under FAS 109. (See PX 185 at p. 64.) As the basis for its December write-downs, Solutia cited the possibility that loss and credit

carryforwards and tax bases of assets could be limited as a result of bankruptcy and "updated expectations regarding near-term taxable income." (See PX 185 at p. 64.) If this write down had been undertaken prior to closing the stage one loan on October 8, then Solutia's secured debt at the time of that loan would have exceeded the 15 percent threshold. Yet, there were no material changes in Solutia's financial picture between October and December prompting a delay in the write down. Under GAAP, this delay was improper.

The record shows that the same facts that prompted Solutia to write down its assets in December indisputably existed prior to the stage one closing. On September 30, 2003, bankruptcy was more than a possibility: Solutia was actively preparing for a filing. (See, e.g., Docket no. 98 at ¶¶139-187.) Even without an unqualified commitment to file, Solutia's preparations had advanced to the point where the potential loss of carryforwards and reduction of tax bases of assets resulting from a reorganization plan *required* a write-down under the strict requirements of FAS 109. (See PX 109 at ¶17(e).) Perhaps more significantly, Solutia knew by September 30 that there would be no near-term taxable income to "absorb the future tax deductions that are represented by its deferred tax assets." (See PX 110.)

Moreover, GAAP required reduction of asset values "if, based on the weight of available evidence, it is more likely that not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized." (See PX 109 at ¶17(e).) That clearly was the state of affairs in late September, and Solutia's failure to write down its deferred tax benefit assets by September 30 contravened FASB's strict warning against "undue optimism concerning future

profitability" and manipulative inflation of assets. [22]  (See PX 109 at ¶¶100-01, 103.)

In sum, under the terms of the Indenture, the December 2003 write-down should have happened in September 2003, if not earlier.  Had Solutia provided for a write-down in *any* amount prior to the October 8 stage one closing, Solutia's total outstanding secured obligations would have exceeded 15 percent of its consolidated net tangible assets and, therefore, the Trustee's secured status would have continued.  The stage one loan therefore cannot be perceived as relieving Solutia of the requirements of the Equal and Ratable Clause.  For this reason, the result below should be reversed and the Trustee's secured status maintained.

### 4.    Solutia's Refusal To Recognize The Effect Of The Blanket Liens Created By The Stage Two Loan Breached The Indenture's Express Terms

The Bankruptcy Court similarly failed to consider the Trustee's argument that the blanket liens provided for in the stage two loan, without more, triggered the Equal and Ratable Clause, thereby providing security for the Trustee's claims even after its bankruptcy filing.  Consequently, Solutia's failure to give effect to the blanket liens independently breached the Indenture.

In Butner v. United States, 440 U.S. 48 (1979), the Supreme Court stated that a "bankruptcy court should take whatever steps are necessary" to ensure that a

---

[22]    Under FAS 109, "[t]he more negative evidence that exists," such as past losses and projected future losses, "(a) the more positive evidence is necessary and (b) the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion or all of the deferred tax asset."  (See PX 109 at ¶25.)  Consistent with FAS 109, Solutia had been advised by its outside auditor that it was "prohibited from using an estimate of future earnings to support a conclusion that realization of an existing deferred tax asset is more likely than not" absent objectively verifiable positive evidence of a "demonstrated turnaround to operating profitability."  (See PX 118, Deposition of Nathan Suddeth, September 22, 2005, at p. 52, lns. 2-19.)

secured creditor is afforded the "the same protection he would have under state law
if no bankruptcy had ensued." Id at 56.  The Court stated unequivocally that the
intervention of bankruptcy should not deprive a creditor of a state law security
interest.  Id.; see also Travelers Cas. And Sur. Co. of America v. Pacific Gas and
Elec. Co., 127 S.Ct. 1199, 1205 (2007) ("'[p]roperty interests are created and
defined by state law,' and '[u]nless some federal interest requires a different result,
there is no reason why such interests should be analyzed differently simply
because an interested party is involved in a bankruptcy proceeding'") (quoting
Butner, 440 U.S. at 55 (other citation omitted); Raleigh v. Illinois Dep't. of Rev.,
530 U.S. 15, 20-21 (2000) (bankruptcy does not alter substantive state law
regarding burden of proof in tax dispute); In re Vienna Park Properties, 136 B.R.
43, 55 (S.D.N.Y. 1992) (this approach "is necessary to prevent the parties –
whether the secured creditor or the debtor – from "receiving 'a windfall merely by
reason of the happenstance of bankruptcy'"), aff'd, 976 F.2d 106 (2d Cir. 1992; In
re Carmania Corp., 154 B.R. 160, 165 (S.D.N.Y 1993) ("Butner stands for the
proposition that [a creditor's] rights in this respect should not diminish or vanish
due to the happenstance of bankruptcy").

     The fact that the automatic stay prevented the Trustee from enforcing its
liens did not alter the validity of the liens or the Trustee's right to adequate
protection.  See In re Vienna Park Properties, 976 F.2d 106, 112-13 (2d Cir. 1992)
("An inquiry into the present enforceability of a security interest is not relevant to
whether that interest exists as an initial matter."); In re Carmania Corp., 154 B.R.
at 165-66 (S.D.N.Y. 1993) (presently unenforceable lien entitled to adequate
protection); In re Northport Marina Assoc., 136 B.R. 911, 919-20 (E.D.N.Y. 1992)
(same).

     For purposes of the present case, without the intervention of the bankruptcy
filing, the stage two loan indisputably would have triggered the Equal and Ratable

Clause under controlling state law.  The Bankruptcy Court agreed that, outside of bankruptcy, the stage two loan would have triggered the Equal and Ratable Clause. (Designation no. 146 at p. 19.)  Yet, with the intervention of the bankruptcy, in keeping with <u>Butner</u>, the result should be no different.  The intervention of bankruptcy may stay enforcement, but the security "is no less entitled to adequate protection."  <u>Vienna Park Properties</u>, 976 F.2d at 117.  Solutia's petition therefore did not negate the Trustee's entitlement to equal and ratable security for its claims. Once again, this legal conclusion compels reversal of the result below.

**B.    Solutia's Implementation Of Its Security Stripping Scheme Independently Breached The Covenant Of Good Faith And Fair Dealing Implied In The Indenture**

While the court below had directed the parties' attention to the issue of good faith prior to trial, its decision after trial summarily dismissed any breach of the implied covenant based on its construction of the Indenture.  The court determined that, because Solutia's security stripping scheme purportedly was not foreclosed by the Indenture's express terms, there could be no breach of the implied covenant. (Docket 146 at p. 20, 27.)  That conclusion does not accurately capture controlling New York law.

In every contract, there is an implied covenant of good faith and fair dealing "that precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement."  <u>Filner v. Shapiro</u>, 633 F.2d 139, 143 (2d Cir. 1980); <u>Dweck Law Firm, L.L.P. v. Mann</u>, 340 F.Supp. 2d 353, 357-58 (S.D.N.Y.  2004) ("persons invoking the aid of contracts are under [an] implied obligation not to frustrate the contracts which they have entered").  "Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith." <u>Travelers Int'l, A.G. v. Trans World Airlines, Inc.</u>, 41 F.3d 1570, 1575 (2d Cir.

1994); Tradewinds Fin. Corp. v. Refco Sec., Inc., 773 N.Y.S.2d 395, 397 (2004)
(same).

 "The covenant encompasses 'any promises which a reasonable person in the
position of the promisee would be justified in understanding were included,' and
prohibits either party from acting in a manner 'which will have the effect of
destroying or injuring the right of the other party to receive the fruits of the
contract.'" Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275, 305
(S.D.N.Y. 1998) (citations omitted); Shamis v. Ambassador Factors Corp., 2000
WL 1368049, at *18-19 (S.D.N.Y. Sept. 22, 2000) (rev'd on other grounds)
(affirming jury verdict that defendant breached the covenant where it manipulated
its performance to deprive plaintiff from "receiv[ing] the fruits of
the . . . Agreement" and failed to notify plaintiff of information that would affect
its rights where it was "readily inferable" under the Agreement that plaintiff would
reasonably expect such notice.).

 In keeping with the covenant's purpose, the Bankruptcy Court's conclusion
– that the lack of a breach of the express terms of the Indenture foreclosed
consideration of a breach of the duty of good faith and fair dealing – misconstrues
New York law.  The covenant of good faith and fair dealing is breached when a
party acts in a manner that, "although not expressly forbidden by any contractual
provision, would deprive the other party of the right to receive the benefits under
their agreement." Jaffe v. Paramount Communications Inc., 644 N.Y.S.2d 43, 47
(N.Y. App. Div. 1996; see Wertheim Schroder & Co. v. Avon Prods., 1993 WL
126427 (S.D.N.Y. April 1, 1993) (denying defendant's motion for summary
judgment, holding that the "covenant of good faith and fair dealing 'is violated
when a party to a contract acts in a manner that, although not expressly forbidden
by any contractual provision, would deprive the other of the right to receive the
benefits under this agreement,'" and noting the possibility of such a breach where

defendant allegedly manipulated the timing of stock dividend payments for the purpose of preventing plaintiff from exercising its stock redemption rights) (citation omitted); Don King Productions, Inc. v. Douglas, 742 F. Supp. 741, 767 (S.D.N.Y. 1990 (same)).

Therefore, contrary to the Bankruptcy Court's reasoning, conduct that may be perceived as technically in compliance with a contract's terms or not expressly foreclosed by those terms still can be a breach of the implied covenant. See, e.g., Chase Manhattan Bank v. Keystone Distributors, Inc., 873 F. Supp. 808, 816 (S.D.N.Y. 1994) (party may breach duty of good faith and fair dealing even without technical breach of contract); Sauer v. Xerox Corp., 95 F.Supp.2d 125, 132 (S.D.N.Y. 2000) ("[S]uch a claim may be brought . . . only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain").

In rejecting any analysis of the implied covenant, the Bankruptcy Court purported to rely on a line of cases providing that actions taken in a party's own self-interest, if consistent with the contract, should not be construed as a breach of the covenant. But these cases do not stand for an immutable legal principle that literal compliance with a contract's terms ends any inquiry into the breach of the covenant. New York law, as noted, is to the contrary. In addition, the line of cases relied on by the court below are inapposite. The Indenture most certainly *does not* expressly authorize – anywhere in its terms – circumvention of the Equal and Ratable Clause by the security stripping scheme Solutia embarked on here. The most that conceivably can be said is that the Indenture does not expressly prohibit that conduct, but that falls far short of expressly endorsing it.[23]

---

[23]    This distinction disposes of the two cases the Bankruptcy Court relied on for its rejection of the Trustee's invocation of the covenant. In Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504 (S.D.N.Y. 1989), and Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,

Continued on following page

The legal misperceptions that infected the Bankruptcy Court's treatment of the Trustee's implied covenant claim alone warrant reversal with directions to consider the matter with the focus controlling law demands. The need to reverse is particularly acute here since the Solutia's security stripping Scheme – in design and effect – *is a breach of the covenant.*

Prior to closing on the stage one loan, Solutia faced extraordinary problems and lacked sufficient liquidity to survive beyond the end of 2003. Solutia had the ability to increase borrowing from its existing lenders, as well as the ability to borrow the needed $500 million in a single step, and either route would have left the Trustee's secured status intact. Instead, however, Solutia launched a security stripping scheme that exacerbated Solutia's liquidity issues and proved more costly than available alternatives. Solutia purposefully borrowed $350 million, far less than it needed to survive, understanding that, if it borrowed just $1,000 more than that, it would trip the Equal and Ratable Clause. This was not a business decision flowing from the legitimate needs of the company – it was a manipulation engineered in breach of principles of good faith and fair dealing. Relevant cases applying New York law agree.[24]

---

Continued from previous page

723 F. Supp. 976 (S.D.N.Y. 1989), the indentures expressly contemplated the subject conduct and, therefore, the invocation of the covenant improperly would have added a limitation which the parties had not provided. Here, however, the Trustee invokes the covenant consistently with the terms of the Indenture and to preserve its benefits.

[24]     In attempting to describe Solutia's "good faith," the Bankruptcy Court recited at length evidence that Solutia's management undertook to benefit Solutia when it implemented the multi-step lien stripping strategy. (Docket 146 at p. 11-12.) These motives do not relate to the purpose and intent of the Indenture or the benefits it provides and thus are irrelevant to the implied covenant or its breach. The court's related observations that the Ableco financing was "consistent with [Solutia's] Board's fiduciary duties," (id. at p. 14), are equally irrelevant for the same reason. Management's performance of a fiduciary duty owed to the corporation does not answer the question of how that conduct intersects with the purpose and intent of the Indenture or the benefits it provides.

In <u>Chase Manhattan Bank</u>, 873 F. Supp. 808, for example, the bank had purchased certain payment streams from defendant Keystone.  Although Keystone had satisfied its literal contract obligations, the bank contended that Keystone violated the covenant of good faith and fair dealing by manipulating its obligations so as to minimize the stream of payments to the bank.  The court agreed that a party may be in breach of its duty of good faith and fair dealing even if it is not in breach of its express contractual obligations.

> [Keystone] contends that the Contract sets forth the only restrictions that apply to the parties and that this Court should not create duties that are not in the Contract.  The Court finds [Keystone's] argument unconvincing.  There exists a duty of good faith and fair dealing, and although Chase's breach of contract claim must be dismissed, Chase has asserted facts which, if true, would give rise to a violation of that duty.  For example, if Chase can prove that [Keystone] manipulated cash flows and fund sales and misrepresented the machinations to Chase, a trier of fact could conclude that [Keystone] breached its duty to act in good faith even though there was no technical breach of the Contract.

<u>Id.</u> at 816.

Similarly, in <u>Van Gemert v. Boeing Co.</u>, 520 F.2d 1373, 1383 (2d Cir. 1975), the court relied on the implied covenant of good faith and fair dealing in refusing to condone a borrower's conduct in giving holders of convertible debentures notice of a conversion deadline that, while technically sufficient, was intended to deprive them of the benefit of their bargain.  The holders did not assume the risk arising from the issuer's deliberate attempt to circumvent the terms of the indenture.  <u>Id.</u> at 1383-85.

Applying the reasoning of <u>Van Gemert</u>, the court in <u>Pittsburgh Terminal Corp. v. Baltimore & Ohio Railroad Co.</u>, 680 F.2d 933 (3d Cir. 1982), likewise refused to validate corporate action that, while technically permissible, effectively deprived holders of convertible debentures of an opportunity to convert.  In

looking at the breach of the covenant, the court rejected the argument that taking actions in furtherance of a "valid business purpose" satisfied the requirement of good faith and fair dealing:

> Of course, [this action] was good business for some of the interested parties. Clearly, however, it was bad business for the Bondholders. Any manipulative act or practice can be justified by focusing only on the business purpose of the side of the transaction which benefited from it.

Id. at 942.

Consistent with these authorities, Solutia too acted in derogation of the contractual protections provided to the Trustee and with the express intent to undermine those protections. Its scheme is either a breach of the express terms of the Indenture for all the reasons noted above or a manifest breach of the implied covenant. Reversal is required for this latter reason also. See Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989) (reversing summary judgment and holding that defendant may have breached the implied covenant when he allegedly withheld information from financial experts in order to make "a disingenuous determination that would create a windfall for him" under the agreement); Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 89-90 (1933) (reversing lower court rulings and holding that defendant violated the implied covenant when it produced a "talkie" without compensating plaintiff, where the contract did not contemplate the not-yet-invented technology but limited defendants rights to similar productions).

**C.**    **The Bankruptcy Court Committed Reversible Error When It Failed To Address The Trustee's Claims For The Equitable Preservation Of Its Liens**

The Bankruptcy Court gave short shrift to the Trustee's equitable claims for the same reason it dismissed any analysis of the covenant of good faith and fair dealing.  That is, the court found that, because Solutia's lien stripping scheme technically did not breach the Indenture, there was no basis on which to provide the Trustee with equitable relief to preserve its liens.  This reasoning too is reversible error and, as with the breach of the covenant, at a minimum, warrants a remand with directions to consider the Trustee's equitable claims.

Contrary to the Bankruptcy Court's analysis, the Trustee's equitable claims must be evaluated independently and cannot be disposed of simply because no breach of contract allegedly occurred.  The role of equity – to reach out and remedy improper conduct – is well-established under New York law, see, e.g., Warren v. Union Bank of Rochester, 157 N.Y. 259, 270 (1898), and just as well-grounded in bankruptcy law also.  Pepper v. Litton, 308 U.S. 295, 307-08 (1939 ("In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift [through] the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate"); In re Kaiser Aluminum Corp., 456 F.3d 328, 340 (3d Cir. 2006) (recognizing independent equitable powers of bankruptcy court).

Here, the Trustee established two separate bases on which equity should act to preserve its secured status:  (1) by treating the stage one and stage two loans as a single overall transaction; and (2) by taking the steps necessary to ensure that Solutia's lien stripping did not defeat the Trustee's security.  Both grounds are amply supported by the record.

1.    **Equity Should Treat The Stage One And Stage Two Loans As A Single Overall Transaction For The Purpose Of Preserving The Trustee's Secured Status**

The Bankruptcy Court never addressed the relevant facts or the controlling law supporting the Trustee's claim for treating the stage one and stage two loans as a single overall transaction as a matter of equity.  Instead, relying on Solutia's purported business reasons for pursuing the financing in two stages, it found as a matter of fact (not equity) that the two loans were separate transactions.  But neither the court's reasoning, nor its finding, properly addresses the Trustee's claims for treating the two loans, as a matter of equity, as a single overall transaction.

The fact that the stage one and stage two loans technically could be labeled as separate transactions in no way disposes of the equitable inquiry.  Even if Solutia viewed the two stages as separate when it developed its lien stripping scheme in the Summer and Fall of 2005, equity takes a different perspective. Equity considers the actual circumstances of the entire financing scheme and, retrospectively, determines whether the transactions associated with the scheme should be treated as part of a greater whole.  In that regard substance, not form, must control.

For example, in <u>Orr v. Kinderhill Corp.</u>, 991 F.2d 31, 35 (2d Cir. 1993, the court refused to "turn a blind eye to the reality that" a transfer of real property and a subsequent distribution of stock in transferee corporation "constituted a single, integrated transaction," and collapsed the transactions.  As the court put it:  "In equity, 'substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done.'"  "Where a transfer is only a step

in a general plan, the plan 'must be viewed as a whole with all its composite implications.'" 991 F.2d at 35 (citations omitted).[25]

Similarly, in In re Phar-Mor Sec. Litig., 185 B.R. 497, 503 (W.D. Pa. 1995, the court likewise treated a sale of stock and a tender offer as a single transaction because they were "part of an integrated transaction." The court in Phar-Mor refused to "examine the tender offer in isolation, rather, we will analyze the net effect of the integrated transaction upon the debtor." Id.

In keeping with these authorities, courts specifically have decried efforts to circumvent the equal and ratable clauses of an indenture through a multi-stage "creeping securitization" of competing lenders' claims. In re Associated Gas & Elec. Co., 61 F. Supp. 11 (S.D.N.Y. 1944), aff'd, 149 F.2d 996 (2d Cir. 1945), is illustrative. There, bondholders claimed that the debtors used multiple transactions in order to circumvent covenants requiring the debtors to grant the indenture trustee liens equal and ratable with those granted to other lenders and prohibiting any consolidation or merger unless the successor corporation expressly assumed the bond indebtedness. Addressing objections to a proposed compromise of this litigation, the district court wrote: "The very thing that the covenant was designed to prevent, was accomplished by . . . management in a series of transactions." Id. "[I]f we consider the substance and not the form, the conclusion is inescapable that the . . . series of transactions . . . violated the covenant of the Ageco FID

---

[25]    See also HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995) ("[i]t is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction…."); MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co., 910 F. Supp. 913, 934 (S.D.N.Y. 1995) ("a court will look past the form of a transaction to its substance . . . [and] 'where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.'") (citation omitted); In re Best Products, Co., 157 B.R. 222, 229-30 (Bankr. S.D.N.Y. 1993) (collapsing a transaction in which a sublease between subsidiary and parent corporations was used as financing vehicle).

indentures." <u>Id</u>.  "We must ever keep in mind that we are dealing with realities. Creditors are 'not interested in mere forms.'" <u>Id.</u> (quoting special master).

With this "substance over form" distinction in hand, the <u>Associated Gas</u> Court then observed that "[t]he indirect means by which this unlawful end was accomplished only serve to accentuate the real purposes of these transactions." <u>Id.</u> Rejecting the argument that there was no actual mortgage or pledge triggering the equal and ratable clause, the court reasoned that "the result achieved was practically the same as a mortgage or pledge," the "impairment of the priority position" of holders was apparent, and the negative pledges of the indentures were intended to protect holders against any such result.  <u>Id.</u> at 29.  The court concluded that, "using its powers as a court of equity," it could enforce the covenants and rank holders on a parity with the new lenders.  <u>Id.</u> at 31.

Finally, the court in <u>Alleco, Inc. v. IBJ Schroder Bank & Trust Co.</u>, 745 F. Supp. 1467 (D. Minn. 1989), applied similar reasoning in holding that a debtor's technical compliance with a covenant restricting payments of dividends violated the parties' indenture.  Preliminarily, the court observed that, were a debtor permitted to use a shell corporation to "sidestep" its promise to maintain assets, the covenant "would provide little or no protection for debenture holders." <u>Id.</u> at 1474-75.  "If [covenants] are to have any meaning, courts must consider the substance of the disputed transaction." <u>Id.</u> at 1475.  Concluding that the transactions violated the indenture, and that management had "pursued these schemes with utter disregard for the rights of the Debenture holders," <u>id.</u>, the court granted summary judgment in favor of the indenture trustee.  <u>Id.</u> at 1477.

The reasoning in these cases, together with the equitable principles they employ, could have been written for this case.  Looking at the substance of the liquidity crisis facing Solutia, there can be no real dispute that $350 million was not going to be sufficient to meet its continuing financial needs.  Another $150

million was going to be required and that was no secret from the first time the financing scheme was considered and proposed. Solutia then pursued its bankruptcy filing and immediately borrowed the next $150 million, consistent with its admittedly dire financial circumstances. Because stage one provided only $350 million of the necessary $500 million, it need not, as a matter of equity, be recognized as an independent transaction even if, as a matter of form, it was executed independently. Equity acts "on the economic realities of what took place . . . ." In re Best Products Co., 157 B.R. at 229-30. Given the economic realities here, proper application of equitable principles compels that Solutia's two-step attempt to unjustly dispose of its creditor's rights should be rejected and the Trustee's secured status preserved. At the very least, the result below should be reversed with direction to the Bankruptcy Court to apply the controlling law and consider whether that should be the case.

> ### 2. Equity Should Maintain The Trustee's Secured Status To Preserve Its Legitimate Expectations

Independently of looking at the substance of the loan transactions, equity will not permit a debtor to use bankruptcy to deprive a secured creditor of its rights. In such circumstances, the court should impose an equitable lien upon the debtor's assets, co-extensive with the liens that would arise had the debtor not embarked on its deprivation scheme. While the substance of Solutia's financing scheme, without more, warrants imposition of an equitable lien, Solutia's delay in complying with FAS 109 confirms the Trustee's right to equitable relief.

The right to recognition of an equitable lien as a remedy for violation of an equal and ratable clause was established in Chase Nat. Bank v. Sweezy, 281 N.Y.S. 487 (Sup. Ct. 1931). The court there brushed aside the argument that the holders had no right to any lien because the covenant was "negative in character."

Sweezy, 281 N.Y.S. at 491.  "Equity takes hold of the subject with a strong hand in order to enable the mortgagee to get what the mortgagor intended to give, provided no other interest is involved."  Id. (citations omitted).  Giving holders the benefit of the equal and ratable clause, the court held that the debtor's attempt to pledge collateral "created an equitable lien as to any such property in favor of the debenture holders," entitling the holders to share equally and ratably.  Id. at 491-92.

Similarly, in Kaplan v. Chase Nat. Bank, 281 N.Y.S. 825, 826 (Sup. Ct. 1934), the court affirmed holders' rights to an equal and ratable lien.  Considering whether transactions violated the indenture, the court focused on the debtor's intent to circumvent the equal and ratable clause:

> Under the circumstances, the question is undoubtedly one of intent. The intent found here was one to avoid the provisions of the indenture which was accomplished by stamping the notes paid and indulging in the other mummeries of banking practice. . . .  The relief to be given is . . . to do what the defendant should have done, apply [the collateral] ratably to the debentures.

281 N.Y.S. at 826-27.

More recently, in In re Howard's Appliance Corp., 874 F.2d 88 (2d Cir. 1989), the court confirmed that equity will not permit the intervention of bankruptcy to defeat the priority of a creditor's claim.  There, the debtor moved its inventory from New York to New Jersey without notice to the secured creditor, Sanyo, then filed bankruptcy.  Although Sanyo had failed to timely file financing statements in New Jersey, the court held that a constructive trust attached prepetition, giving Sanyo "a position superior to that of any lien creditor and to any of Howard's other creditors as well":

> While Howard's contentions that the decision to warehouse in New Jersey was "borne of necessity" and "not out of sinister motives" do not fall upon deaf ears, we agree with the bankruptcy court that

> Howard, in light of its conduct, "acted with the expectation that Sanyo
> would not perfect its security interest in this inventory by filing a
> financing statement in New Jersey."

Id. at 94-95.

The court in Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206 (3d Cir. 1990), provided similar relief in a case that, like the one now presented, involved a scheme in which a friendly lender assisted a debtor in attempting to deprive creditors of their rights.  The shareholders of Vantage Steel had agreed with the company's secured lender that the lender would foreclose on the company's assets and the shareholders would buy them, using a new entity and new loans from the same lender, thereby eliminating the rights of unsecured creditors.  Although the shareholders insisted that the foreclosure sale insulated them from any claims, the court affirmed that the transactions were "in reality a single transaction functioning as a subterfuge," id. at 212, and imposed a constructive trust on the new company's equity interests for the benefit of the original debtor's unsecured creditors.

The equitable principles applied in the foregoing cases too could have been scripted with this case in mind.  Solutia should not be permitted to benefit from its lien stripping scheme and the Trustee should be provided with equitable liens to foreclose the intended effects of its scheme.  Again, at a minimum, the result below should be reversed with direction to consider this issue.

## D.    The Bankruptcy Court Committed Reversible Error In Failing To Consider Whether The Trustee Is Entitled To Adequate Protection

Because it rejected the Trustee's legal and equitable claims, the Bankruptcy Court never looked at the Trustee's request for adequate protection.  The necessary reexamination of the substance of the Trustee's legal and equitable claims at a minimum compels remand of the request for adequate protection.  If this Court

holds that the Trustee is entitled to secured status as a matter of law or equity, the Trustee is entitled to adequate protection of its liens.  See 11 U.S.C. §§ 361, 363, 364; In re WestPoint Stevens, Inc., 333 B.R. 30, 37-48 (S.D.N.Y. 2005).

## CONCLUSION

The Bankruptcy Court's decision after trial embodies significant legal errors in its treatment of the Trustee's breach of contact claim, as well as its claims regarding the breach of the implied covenant and in equity.  These errors improperly vindicated Solutia's security stripping scheme – a scheme which cannot be countenanced as matter of law and equity.  We urge this Court to so hold and reverse the result below.

Dated:  August 8, 2007

REED SMITH LLP

By: /s/   Andrew L. Morrison
      Andrew L. Morrison (AM 1071)
      REED SMITH LLP
      599 Lexington Avenue
      New York, New York  10022
      (212) 521-5400


      Eric A. Schaffer (ES 6415)
      James C. Martin (*Pro hac vice*)
      REED SMITH LLP
      435 Sixth Avenue
      Pittsburgh, Pennsylvania  15219
      (412) 288-3131

**Attorneys for Appellant Wilmington Trust Company, as Indenture Trustee**